## Stewart v. Wurts.
## Horrocks v. Calvin.
## Lawrence v. Hughes.
## Scott v. York.

(Decided March 18, 1911.)

### Appeals from Boyd Circuit Court.

1.  Elections—Registration—Removal of County Seat.—Where a registration only shows 98 votes more than the registration the previous year, one of the issues of the election involving the removal of the county seat, there is little force in the contention that the increase in the registration furnished strong or sufficient evidence that voters illegally registered, or votes were illegally cast, the voting population numbering only about 1,000.

2.  Same—Designation of Names on Registration Books.—Where a city is irregularly laid out, many persons not living on any street, houses being generally un-numbered, and many of them reached by alleys or inlets, it is well-night impossible to correctly designate on the registration books the places of residence of the voters.

3.  Same.—In such a state of case an occasional failure by the registration officers to designate on the registration books opposite the name of the registered voter the place of his residence as required by the statute, should not invalidate the registration, or give cause for rejecting such votes.

4.  Same—Use of Money in Elections—Improper Use of—Must be Positive Proof of to Set Election Aside.—While the improper use of money in elections is to be deplored, should be prevented. Courts can not, upon mere suspicion, declare an election void merely because money may have been appropriated for some sort of use therein. There must in such case be some tangible, positive proof that it was corruptly used, to justify a court in declaring an election void.

5.  Same—Evidence.—Held that in these actions the evidence is not sufficient to set the election aside and declare it void. Appellants do not claim they were elected, and the alleged irregularities and frauds relied upon are not such as to warrant the court to declare the election void.

ZERFOSS & WEAKLEY, H. R. DYSARD and S. S. WILLIS for appellants.

GEO. B. MARTIN, P. K. MALIN, DINKLE & PRITCHARD, H. F. PRICE and F. C. MALIN for appellee.

OPINION OF THE COURT BY JUDGE SETTLE—Affirming.

These several contests grew out of an election held in the various precincts of Boyd county, in November, 1909, for the purpose of filling the several county offices therein. In addition to the candidates for county offices, the electors of the county voted for candidates for State Senator, the Legislature, Circuit Judge and Commonwealth's Attorney. Also upon the following four questions:

1st. A proposed amendment to the State Constitution; 2nd. Whether the county should issue $100,000 of bonds for the improvement of its public roads; 3rd. Whether a board of commissioners should be substituted for the Fiscal Court; 4th. Whether the county seat should be removed from Catlettsburg to Ashland. It goes without saying that the election for the various offices, and with respect to the several questions involved, excited great interest and brought out to the election nearly every voter in the county; the number of votes cast exceeding

5,000. At the election the appellee, John Wurts, Democratic candidate for County Judge, on the face of the returns received 2,573 votes; and the appellant, J. F. Stewart, Republican candidate for that office, 2,492 votes, the majority for Wurts being 45 votes. The appellee, George W. Calvin, Democratic candidate for Sheriff, received 2,538 votes as against 2,503 cast for the appellant, C. E. Horrocks, the Republican candidate for the same office, making a majority of 35 votes for appellee, Calvin. The appellee, E. S. Hughes, Republican candidate for the office of County Court Clerk, received 2,553 votes, and the appellant E. E. Lawrence, Democratic candidate for that office, 2,497 votes, making a majority of 56 votes for the appellee, Hughes. The appellee, J. M. York, Republican candidate for justice of the peace in magisterial district No. 1, received 593 votes and the appellant, John Scott, his Democratic opponent for the same office, 559 votes, making York's majority 34 votes.

The county board of election commissioners after receiving the returns from all the precincts and ascertaining the result, duly issued to each of the appellees a certificate of his election, and by virtue thereof each gave bond, took the necessary oath and was inducted into the office, to which he appeared to have been elected.

The appellants, declared by the county board of election commissioners to have been defeated at the election, by their respective petitions filed in the Boyd Circuit Court, contested the election; praying that they be judged elected to the respective offices for which they were candidates, or, in the event that this be not done, that the court adjudge that there was no valid election in the county

In the cases of Stewart v. Wurts; Horrocks v. Calvin and Lawrence v. Hughes, each petition confines the charges of illegal voting and irregularities in the election to four precincts, viz.: No. 1, called the Court House precinct; No. 2, known as Patten Mill precinct; No. 3 known as Hampton City precinct and No. 16, designated as Arigo precinct, all within the corporate limits of the city of Catlettsburg.

In the case of Scott v. York, the petition not only charges illegal voting and irregularities in the election as conducted in the four precincts of Catlettsburg named, but likewise in country precinct, No. 14 known as England Hill. It appears from the election returns, as cer-

tified by the board of election commissioners, that in Court House precinct (No. 1), the appellee, Wurts, received a majority of 151 votes; the appellee, Calvin, a majority of 117 votes; the appellee, Hughes, a majority of 147 votes, and the appellee, York, a majority of 29 votes. That in Patten's Mill precinct (No. 2) the appellee, Wurts, received a majority of 90 votes; the appellee, Calvin, a majority of 71 votes, and the appellee, York, a majority of 43 votes.

That in Hampton City precinct (No. 3) the appellant, Stewart, received a majority of 27 votes; the appellant, Horrocks, a majority of 6 votes. In this precinct, however, the appellee, Hughes, received a majority of 70 votes, and the appellant, York, a majority of 16 votes.

That in Arigo precinct (No. 16) the appellee, Wurts, received a majority of 68 votes; the appellant, Lawrence, a majority of 45 votes; the appellee, Calvin, a majority of 53 votes, and the appellee, York, a majority of 12 votes.

The grounds of contest set forth in each of the petitions are:

1st. That of the persons voting in the four precincts of Catlettsburg, 300 were not legal voters in the city; many of these being, as alleged, non-residents, minors and felons.

2nd. That a conspiracy existed between the supporters of appellees and persons making a fight to retain the county seat at Catlettsburg to accomplish the defeat of the candidates favorable to the removal of the county seat from that city to Ashland; that as the result of such conspiracy a free and equal election was prevented, frauds were perpetrated and money, appropriated by the city council of Catlettsburg, illegally expended in securing persons to register and vote who were not legally entitled to do so; and that at least 250 illegal votes were cast in the city of Catlettsburg and counted for appellees.

3rd. That the registration officers did not by proper entry on the registration books opposite the name of each person registering, indicate the house, street or alley of his place of residence, or the cross street nearest thereto.

4th. That at the election persons offering to vote were not required to present their registration certificates; and that in many of the city election precincts persons not present or voting, but who had registered, were personated by others who were illegally permitted to vote in their names and stead.

5th. That in each of the Catlettsburg precincts not less than fifty persons were permitted to vote without having been sworn, and their ballots illegally placed in the ballot box, counted and certified for the appellees.

6th. That in the court house precinct (No. 1), the ballots were exposed and examined by the election officers and others, after being marked by the voters, and before they were placed in the ballot box.

7th. That certain persons named in each of the petitions, not entitled to vote, were nevertheless illegally permitted to do so; 77 of them in precinct No. 1; 9 in precinct No. 2; 26 in precinct No. 3; and 24 in precinct No. 16.

8th. That in precinct No. 1 the election officers, after the close of the polls on election day, remained at the voting places all night and did not announce the vote of that precinct until the result of the election in all other precincts in Boyd county had been heard from; that during their stay at the voting place and throughout the night, the election officers permitted other persons to visit and communicate with them; that one of the officers of election in precinct No. 1 was so sick during the counting of the ballots as to be of no assistance in the work; that a recount of the ballots in the four precincts of Catlettsburg would show that appellants received more and appellees fewer votes than were counted or certified for them respectively, and prove the election of the former by decisive majorities.

The answer of each appellee traversed the averments of the petition to which it was filed, but admitted that three persons, who were not legal voters, were permitted to vote in the city of Catlettsburg. It was, however, alleged in each answer as grounds of counter contest that divers persons not entitled to vote were illegally permitted to do so in precinct numbers 10, 12, 13, 18, 20, 21, and 23, and that these illegal votes were cast for appellants and counted by the election officers for them; also that in a few instances persons in the precincts named were illegally permitted to vote openly for appellants; that such illegal voting did not result, however, from any fraud or intentional wrong-doing on the part of the election officers, but from their ignorance and misconception of the election law.

Appellants took the depositions of 82 witnesses in endeavoring to make good the grounds of contest al-

leged in their several petitions, but much of this testimony was irrelevant or mere hearsay. Upon the submission of the cases the ballot boxes of precincts 1, 2, 3, 14 and 16 were produced and opened by the court and all the boxes, ballots and tally sheets were found to be in proper order. Upon a recount of the ballots by the court it was found that appellee, Wurts, gained five votes, making his majority over the appellant, Stewart, 50 instead of 45 votes; that appellee, Calvin, gained 3 votes, making his majority over appellant, Horrocks, 38 instead of 35 votes; that appellee, Hughes, gained 1 vote, making his majority over appellant, Lawrence, 57 instead of 56 votes; and that as between the appellant, Scott, and appellee, York, the majority of the latter was the same as returned by the county board of election commissioners, viz., 34 votes.

After a careful consideration by the able and painstaking judge of the circuit court of all the evidence he in substance found—

1st. That while there were some illegal votes cast at the election, they were not sufficient in number to affect the general result.

2nd. That such illegal votes as were cast were not so cast by the procurement of the contestees, their friends or supporters, or by any fraud on the part of the contestees, their friends or supporters; and that it was not apparent from the evidence that the contestees were the beneficiaries of the illegal votes that were cast.

3rd. That there were some irregularities in the manner of conducting the election, but no fraud practiced by the officers of election.

4th. That sixteen persons whose names appear in the judgments voted at the election who were not legally entitled to do so; and that six legal voters whose names also appear in the judgments, were permitted to vote in an illegal manner.

5th. That except as to the twenty-two voters referred to, all others charged by appellants to have been illegal voters or to have voted illegally at the election were legal voters and voted legally. In conformity to these findings the judgments declared appellees entitled to the offices held by them respectively, and dismissed appellants' petitions. The latter complain of the judgments, hence these appeals.

It is argued by counsel for appellants that as there was at the election of November a largely increased registration and vote over that of any previous election, that fact furnishes strong evidence that illegal votes were registered for and cast at that election. According to the evidence found in the record there were registered for this election 1,019 voters, and the number of votes cast was 974, or 75 less than the total registered vote. The largest previous registration in the city was that made for a local option election that took place in April, 1909. The total number of votes shown by that registration was 921, or only 98 votes less than shown by the registration for the election of November, 1909.

This difference is not unreasonable in view of the exceptional circumstances and conditions surrounding the November election; in addition to the interest that invariably attends an election of county officers and that attending the proposed amendment of the Constitution and bond issue, the matter of paramount interest to the voters of Catlettsburg involved in the election was the question whether the county seat should be removed from that city to the more populous city of Ashland. Catlettsburg became the county seat with the creation of Boyd county and it has since remained the county seat, notwithstanding the insistent demands of the people of Ashland that the seat of government be removed to that city. The population of Catlettsburg will not exceed 5,000 and it is not a manufacturing city; its chief asset is the fact of its being the county seat of Boyd county, and it is but natural that its citizens should feel that the loss to it of the seat of government would decrease its population, lessen the value of its property, and otherwise disastrously affect its future. In view of this situation it was to be expected that the people of Catlettsburg would use all means that could legitimately be employed to secure the registration for and vote at the election of every resident of the city legally entitled to vote. The interests at stake also afforded a positive incentive to the indifferent, who often fail to vote, to do so at this election, and to cause the return of every absent citizen entitled to vote in Catlettsburg to register for and vote at the election.

According to the evidence appearing in the record, many of the residents of Catlettsburg secure employment elsewhere, yet retain their citizenship there. Catletts-

burg is situated at the mouth of the Big Sandy river. It is the harbor for all the timber and coal that is floated out of that stream, and the base of supplies for the lumber and mining camps that line its banks. Many of the men who work at these timber and mining camps along the river, both in and beyond Boyd county, have their homes and maintain their families in Catlettsburg, although compelled to be almost constantly away from them; and these men, it may well be supposed, were urged to return to Catlettsburg and in most instances did so, in order to register for and vote at the election of November, 1909, and thereby prevent the removal of the county seat at Ashland. Naturally the increase in registration and in the vote cast, caused by the interest taken in the question of removal of the county seat, caused a larger vote to be cast for the candidates for the various offices to be filled than they would otherwise have received. In view of the foregoing facts we find little force in the contention that the increase in the registration for and in the vote cast at the election of November, 1909, furnished strong, or any sufficient evidence, that voters illegally registered or that votes were illegally cast.

The charge that at least three hundred voters were illegally registered in the city of Catlettsburg is unsupported by the evidence. The charge is based upon the difference in the number of persons registered for the election of November, 1909, and the number shown by the previous registration, rather than upon proof of the names and number of persons claimed to have illegally registered. We have been unable to definitely find from the evidence that as many as thirty persons were illegally registered and except as to twenty-two of these it was not made to appear whether they voted for appellants, or appellees.

With respect to the charge that minors and felons were permitted to register and vote it is only necessary to say that it was proved that in the four Catlettsburg precincts and in the England Hill precinct, three men who had been convicted of felony and three under twenty-one years of age were permitted to vote, but whether for appellants or appellees was not made to appear.

As connected with the charge of illegality in the registration of voters, it is complained by appellants that the registration books were not made to show opposite

the name of each voter the number of his house, name of the street upon which it was situated, or block of which it was a part. It appears that in some instances this was not done, but in most instances it was. It also appears from the evidence that the houses of Catlettsburg are not consecutively numbered, and a majority of them are not numbered at all; that the city is not regularly laid out in definite squares or numerous streets, but is an irregular city fronting about two miles on the Ohio river and lying in a narrow bottom; that many of the voters do not live upon any street but on the hillside, their houses being reached by alleys or inlets; that the irregular streets of the city are not well known, even to those who reside upon them, and in some instances there are different streets bearing the same name, due to extensions of the city limits to include such suburbs as Hampton City and Arigo City, both of which are now part of Catlettsburg. For the foregoing reasons the matter of correctly designating on the registration books the places or locality or residence of the voters of Catlettsburg was well-nigh impossible, but the books of registration for the election of November, 1909, were not less specific or accurate in this respect than were those of previous registrations.

In such a state of case as is here presented we are unwilling to say that an occasional failure by the registration officers to designate on the registration books opposite the name of a registered voter the place or locality of his residence as required by the statute, will invalidate the registration or give cause for rejecting the vote of the person so registered without such designation.

It is likewise charged by appellants that voters in the city of Catlettsburg were not required by the election officers to present their registration certificates before voting.

It appears from the testimony of all election officers of whom the inquiry was made and all voters, save two, who were interrogated on the subject, that presentation of the registration certificates was required of every voter. The two voters who testified to the contrary were Sam Bocock and John Bocock, who stated that at the time of voting they did not have their registration certificates with them. If they are to be given credit we must conclude that they alone of all voters at the election were not required to exhibit their certificates. It is patent that

the contention of appellants as to the alleged failure of the election officers to require of the voters presentation of their registration certificates is not sustained by the evidence. We must, therefore, reject it.

Appellants' charge that 300 illegal votes were cast in the city of Catlettsburg by non-residents of the State or city seems purely speculative. Appellants do not name in their pleadings all of these alleged illegal voters, but attempted to sustain the charge by calling the attention of different witnesses to the names of certain of them, and inquiring of such witnesses if they knew them, where they lived, etc. Some of the witnesses would answer that they knew the persons inquired about and others that they did not. It appears from the evidence that some of the voters inquired about, and who were unknown to some of appellants' witnesses, had lived in Catlettsburg all their lives and had never voted elsewhere; and that others unknown to many of the witnesses had a legal residence in that city but were much of their time or almost continually, absent because they had business or work elsewhere. In most instances appellees furnished evidence establishing the residence in Catlettsburg of the persons under investigation and their right to vote therein. Few persons are well enough acquainted with the population of even a small city like Catlettsburg to be able, when shown a paper containing a list of names, to readily identify any considerable number of them by name and place of residence. Indeed, several of appellants' witnesses admitted that they did not know fifty per cent of the voters of Catlettsburg. The character of its population is unlike that of most cities of its size. As previously stated, many of its citizens have work and business elsewhere, some of them in Boyd, and adjacent counties in this State, others in West Virginia, which renders their names and faces unfamiliar to many of the constant residents of the city, yet they have never ceased to be residents and voters of Catlettsburg.

The following excerpt from the opinion in the contested election case of Erwin v. Benton, 120 Ky., 538, is applicable to the question we are here considering:

"A number of votes were contested because it was alleged that the voters were not residents of the precinct where they voted. Others were refused the right to vote because they were told they were not legal voters. These were dependent upon the fact of their residence.

Some people without families and of wandering dispositions, or whose calling do not admit of their stopping long at one place, cannot always establish the fact of their residence being at a certain place as satisfactorily as those whose habitations are fixed. Yet, in law, every person has a domicile. In some instances it may be different from his actual abode. Until he has changed it, which is a combination of act and intention, it continues to be his domicile in law. Where one has had an actual domicile and departs from it temporarily intending to return it will remain his legal domicile for all purposes.''

It is but fair to admit that appellants' evidence as a whole shows that some non-residents illegally voted in the four Catlettsburg precincts, but except in a few instances, it failed to show whether the votes of such non-residents were cast for appellants or appellees. The circuit court after a careful analysis of the evidence found that only twenty-two illegal votes, including those of non-residents, were cast or counted in the election and these were properly deducted. Baker v. Dinsmore, 138 Ky., 277; 127 S. W., 997.

There were, according to the evidence, in two or more Catlettsburg precincts a few votes cast openly without the voter first taking the required oath, which made the votes illegal, but these votes constitute the six classed by the circuit court as votes cast illegally and were as a part of the twenty-two deducted in the recount of the ballots. We find no reason for disagreeing with the circuit court's ruling in this matter and think it properly confined the entire number of illegal votes to twenty-two in number.

The charge of fraud and wrong-doing made against the election officers of precinct No. 1 (court house) is not sustained by the evidence. It is true that they remained at the voting place the entire night following the election and did not complete their work until 7 o'clock the next morning, after the returns were in from all the other precincts in the city and county. But, according to the evidence, there was ample cause for the delay; the vote of precinct No. 1 was the largest in the city or county, and there was in that precinct much crossing of votes or scratching of ballots, and it required constant examination of the ballots, a great amount of counting, recounting and tabulating of the votes, to ascertain and declare the result. Moreover, the election officers were

hampered by the illness of one of their number who, notwithstanding such illness, stood to his post and rendered all the assistance of which he was capable.

With the exception of the few votes thrown out in that precinct by the circuit court, there was no proof that the election officers thereof did not faithfully, or properly perform their duty, or that the returns from the precinct were not correct. There was no direct proof, or even circumstance of a convincing character, that tended to show any tampering with ballots by the election officers; that they falsified the returns, or allowed persons other than themselves to enter or remain in the room where they were at work; nor was there any direct proof that one or two of the election officers were under the influence of intoxicants as charged. The most that can be said of the evidence that was introduced by appellants along these lines is, that it merely served to create a suspicion that there was some sort of wrong-doing on the part of the election officers, which suspicion was dispelled by the testimony of the election officers and other witnesses introduced by the appellees with respect to the charges of misconduct made. Baker v. Dinsmore, 138 Ky., 277; 127 S. W., 997; Preston v. Price, 27 R., 588.

The charge of the illegal use of money and bribery in the election on the part of appellees is likewise unsustained by the proof. It does appear from the evidence that previous to the election the candidates on the Republican and Democratic tickets raised and put out in the county a fund of $1,500 for each ticket, but the evidence fails to show that any of this money was used for purposes of bribery. We may suspect that it was so used, but in the absence of proof on the subject it may as well be presumed that the money was used and expended for printing, paying speakers and other legitimate campaign purposes. It was also shown by the proof that a short time before the election the city council of Catlettsburg appropriated $2,500 to aid in retaining the county seat in that city. The evidence fails to show that this money was used to bribe voters. There was some evidence tending to prove that one Price, a manager for Catlettsburg, paid five persons, claimed to be residents of Huntington, West Virginia, to vote at the election in favor of retaining the county seat at Catlettsburg, but the evidence did not show that the money so used by Price was a part of the sum appropriated by the

city council. There was, however, much evidence to the effect that an indebtedness larger in amount than the sum appropriated by the council was incurred during the several weeks before the election, for speakers to deliver speeches throughout the county in favor of retaining the county seat at Catlettsburg; that expenditures were made for the hire of vehicles used by them and in the publication of circulars and other literature favoring Catlettsburg as the county seat: likewise in defraying the expenses of a committee sent to Washington to procure a government appropriation for the erection of a public building at Catlettsburg with the expectation that such building would be an aid in retaining the county seat at Catlettsburg; and that in order to insure the payment of these expenses it was thought safer to procure the appropriation from the city council before the election than to postpone it until later.

The evidence also shows that a considerable sum was raised and used by the citizens of Ashland for the purpose of securing the removal of the county seat to that city; but as in the case of the city of Catlettsburg, the evidence failed to show that the money thus raised was used in buying votes or bribing voters.

However much we may deplore the improper use of money in elections, we cannot afford upon mere suspicion to declare an election void merely because money may have been appropriated for some sort of use therein; there must be in such case some tangible, positive proof that it was corruptly used in violation of law, to justify a court in declaring the election void.

The evidence does not sustain the further charge of appellants that a conspiracy was entered into between appellees and the authorities of the city of Catlettsburg for the purpose of illegally securing the election of appellees or the retention of the county seat in that city. It is true that the matter of whether the county seat should be removed from Catlettsburg to Ashland was the vital question involved in the election, and we are satisfied that appellees were elected because they favored the retention of the county seat at Catlettsburg, but the evidence no more shows a conspiracy between appellees and the authorities at Catlettsburg to retain the county seat there, than it establishes the fact that a conspiracy existed beween the authorities of the city of Ashland and

appellants, the object of which was to remove the county seat to Ashland and secure the election of appellants.

It is not contended by appellants that they were elected to the offices in contest, their only claim is that there were such frauds and irregularities in the election it cannot be told who was elected. This court has repeatedly shown its readiness to set aside elections that were shown to have resulted from fraud, intimidation, or bribery; but the cases now before us do not present such fraud, bribery or wrong-doing in the conduct of the election as would justify our declaring the election void. To so declare we would have to act simply upon speculation or suspicion, and we are unwilling to require the people of Boyd county to undergo the labor, excitement and expense of another election, unless clearly convinced that the results of that of November, 1909, were not fairly and legally attained.

As said in Skain v. Milward, 138 Ky., 200; 127 S W., 773:

"The burden of proof is on the contestants to show such fraud, intimidation, bribery or violence in the conduct of the election that neither the contestant, nor the contestee can be adjudged to have been fairly elected. These things are not presumed. But it must be affirmatively shown, not only that they existed, but that they affected the result to such an extent that it cannot be reasonably determined who was elected. Elections are not lightly set aside. They are the means provided by law for the expression of the will of the people. To set them aside unnecessarily would be to destroy that confidence in them which is essential. If often set aside they would be less attended; for the voters would await the next chance, and the election instead of settling things, would be only the starting point for new controversies. Elections must be free and equal, but they cannot be free and equal unless supported by public confidence. When once the notion prevails that confidence cannot be placed in the stability of elections, their power and usefulness is destroyed."

For the reasons indicated the judgment in each of the cases is affirmed.

The whole court sitting.