# Raymer v. Willis.

(Decided October 20, 1931.)

(Concurring Opinion October 23, 1931.)

(Dissenting Opinion October 24, 1931.)

WHITTLE & DEMUNBRUN, E. N. MAYHUGH and FRANK R. GOAD for appellant.

LOGAN & LOGAN for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

This is a contest over the Republican nomination for representative in the Twenty-Fourth legislative district composed of Butler and Edmonson counties, the primary election having been held August 3, 1931. On the face of the returns, the votes received were as follows: V. T. Willis, 1,059; Clint Raymer, 1,045. There were two other candidates who received a few votes and who are not parties to the proceeding. The appellant, Raymer, instituted this contest against the appellee, Willis, and it was adjudged by the circuit court, after making deductions from both parties, that Willis had been elected by a plurality of 36 votes instead of 14 as disclosed by the returns. The grounds of contest are of three classes or groups, to-wit: (1) The ballots of three precincts should not be counted because the officers of the election did not return them to the county court clerk until Monday morning following the election instead of taking them immediately after the close of the polls on Saturday; (2) certain precincts in Edmonson county should be thrown out because created or established by an order of the county court which was not in accordance with the statute; and (3) numerous illegal individual votes.

■ The new election law enacted by the General Assembly at its 1930 session (chapter 49), in respect to the preservation and canvassing of the ballots, is an innovation and materially differs from the procedure under which we have heretofore operated in this state, and, so far as we are advised, from that of any other state. It is now section 1468 et seq., of the Statutes. Its constitutionally, except as to one provision, was sustained in the opinion of State Board of Election Commissioners v. Coleman, 235 Ky. 24, 29 S. W. (2d) 619.

In the Lee precinct of Butler county, at the close of the polls, the ballot box and envelope containing the unused ballots, stubs, etc., were taken to the home of the Republican judge of the election. He also held the key to the lock fastening the aperture in the box through

which the ballots had been deposited. Under the law, the keys to the locks fastening the lid of the box were held by the election commissioners. The box and envelope remained in the hall of his residence, which was not locked, until the following Monday morning, when it was taken by the Republican judge and the Democratic sheriff, accompanied by other officers of the election, and delivered to the county court clerk before the commencement of the count by the election commissioners. While there is some evidence tending to show that the election officer retaining custody of this box was friendly disposed toward the contestee, who received a majority of the votes in that precinct, and also some testimony tending to impeach his integrity in relation to political elections, though otherwise it is admitted to be unquestioned, he testified that he voted for one of the other candidates, and his reputation for political integrity was sustained by a preponderance of the evidence relating to that subject. He testified positively and convincingly that no one had touched the box after it was deposited in his home until it was removed by the sheriff of the election and himself on Monday morning. The reason assigned for not taking the ballot box in Saturday afternoon, as required by the law, is ignorance of its demand or uncertainty as to what the law required. Under the former statute, when the precinct election officers counted the ballots, they were given two days in which to deliver the box and returns to the county clerk; and these officers had received conflicting advice as to their duty. The election commissioners and the county court clerk assisting them testified that, because of this delay in the delivery of the box, they had taken special care to examine it and the contents, and that there appeared no evidence whatever of any tampering. The number of ballots cast corresponded with the number of stubs, and, although the unused ballots were not so stamped, as required by law, the stubs were so marked, and for each stub there was an unused ballot attached. The printer who had furnished the ballots for the election in that county testified that he had printed no more than those delivered to the county clerk for use. And there is no evidence that there were any extra ballots available.

In the Stockholm precinct of Edmonson county, the officers, after the close of the polls, took the box to the home of George Kerr, living near by, as a matter of con-

venience, and the box was taken to the county clerk on the following Monday morning. This seems to have been the practice under the old law, and the action of these officers was apparently due to ignorance of the terms of the present statute. It is not shown who had the key to the lid of the aperture. The evidence is that this box was protected from invasion and had not been tampered with. The election officers testified that everything tallied and was regular so far as they could tell.

In the Cade precinct of Edmonson county, after starting on the way to the county seat, one of the officers declined to go because he would have to ride horseback in the night. Thereupon the Republican sheriff took the box to his home, and the Democratic judge took the envelope containing the unused ballots and the key to the lid of the aperture. This box was placed in a room and the doors and windows securely fastened. Leaving home on Sunday morning, the officer took the box with him and kept it securely. He was joined that evening by the Democratic judge, and they stayed together until Monday morning, when they both took the box in to the county clerk. The integrity of this box was established.

The statute (section 1482) explicitly states the duties of election officers to be performed after the time for closing the polls shall have arrived, and then gives this emphatic order: "The officers of election shall immediately deliver the ballot box and the envelope containing the unused ballots to the county clerk. The judge and sheriff of election, of opposite political faith, shall forthwith convey said ballot box and envelope to the county clerk's office, taking his receipt therefor. Said officers shall see that no person other than themselves has access to, or custody of, said ballot box, and they shall each remain in the presence of the other, until said box and envelope is delivered to the county clerk."

It is provided that the ballot box shall remain locked from the time it leaves the county clerk's office until unlocked by the election commissioners for the purpose of counting the ballots, which is on Monday following a primary election held on Saturday, and on Wednesday following a general election on Tuesday. After delivery of the boxes and envelopes containing unused ballots, etc., to the clerk, he is required to keep them in a secure and substantial place and maintain a sufficient guard over them until the count is completed.

638

The statute contemplates that the election officers shall proceed with diligence to deliver the box and paraphernalia to the county court clerk, and the discharge of that duty is imperative.

In United States v. Baldridge (C. C.) 11 F. 552, 557, a provision in an Alabama statute that it is the duty of election officers "immediately upon the closing of the polls" to count the votes, it was held to demand a reasonable construction, and clearly means that there should be no unnecessary delay and that no other business shall intervene to occupy and distract the attention of officials until the matter in hand shall be consummated. Delays, it was observed, would offer opportunity for evil-disposed persons to tamper with the boxes and change or rifle it of its contents. Such meaning must be given the word in this act.

Construing the words "immediately" and "forthwith" as meaning without unnecessary delay, or as quickly as practicable, or within a reasonable time, or with due diligence under the circumstances of the particular case, the direction must be rigidly observed; otherwise the system, designed as it is to circumvent ingenious plans and to remedy well-known evils by preventing fraud in the count and the returns, will break down. The difficulty is to construe and apply this provision so as to effectuate its purpose and at the same time not to disfranchise voters by reason of its violation.

Where election officers fail to do their duty in this or any other respect, or shall willfully perform it in such a way as to hinder the objects of the law, they may be punished by fine and imprisonment. But it is a general rule of election law that, if the statutes do not expressly declare that noncompliance with a specified procedure shall result in throwing out the precinct or other district, a noncompliance that does not affect the fairness and equality of the election or the ascertainment of the true result will not vitiate the election. 9 R. C. L. 1091, 1092; Marilla v. Ratterman, 209 Ky. 409, 273 S. W. 69; Muncy v. Duff, 194 Ky. 303, 239 S. W. 49; Craig v. Spitzer, 140 Ky. 465, 131 S. W. 264, and cases cited. Cf. Stewart v. Wurtz, 143 Ky. 50, 135 S. W. 434. To hold otherwise would be to subordinate the substance to the form, the end to the means. It is a transcendent rule that the right of suffrage will not be destroyed by irregularities or derelictions on the part of officers charged

with the duty of conducting the election fairly and honestly, unless their misbehavior was such as to render impossible of judicial determination the will of the people as expressed at the polls.

It is said that, in the absence of suspicious circumstances, a mere irregularity in forwarding returns by election officers will not warrant their rejection. 20 C. J. 196. The converse, of course, is true; and, a fortiori, where a positive direction to deliver the ballots themselves into the hands of the officer charged with their safe-keeping until counted has been disregarded and there has been an unreasonable delay in delivering the ballots, there should be clear and convincing evidence that they have been preserved in the same condition they were in at the close of the polls.

It is the opinion of the court that under this law a disobedience of the statutory mandate by failing to deliver the boxes immediately, as required by the statute, impugns the integrity of the ballots, and they should not be counted unless it is shown by clear and convincing evidence that the ballot box and ballots have not been tampered with and that their integrity has been preserved.

Of course, it may be disclosed that the delay in the delivery of the boxes was a scheme to defraud, or to create confusion, or to destroy the efficacy of the ballots, or to falsify the contents by persons who are interested in having the precinct thrown out or the ballots rejected. That would be an act with the criminal intent to affect the election or result thereof rather than merely failing to perform a duty. When such corrupt action has been disclosed, a different consideration should be given than that outlined. But we have no such situation before us in this case.

We would emphasize the fact that in this opinion it is not intended to announce a rule that would be applicable universally in violations of the statute in the particular respect here involved. Our opinion is confined to the particular facts of this case where the testimony convincingly shows that no fraud was either committed or attempted, nor was any intended. Not only was it so proven by the election officer (which character of testimony is not conclusive on the point), but it is also established by further facts as herein stated. Each case should necessarily be governed by its own facts. If

640

there should be such a number of departures from the requirements of the statute relating to the forthwith delivery of the ballot box to the county court clerk by the designated officers of the election as to indicate a scheme and purpose to violate the statute in that respect so as to furnish opportunities for fraud, and from which an inference could well be made that it was both intended and perpetrated, then a different rule applies, which might possibly require the throwing out of the entire vote cast at such precinct.

The purpose of the statute was to insure fairness and honesty in elections, and the same should be the motive of each and every officer having duties to perform in the conduct of elections; and, when the testimony is of such a nature as to indicate a determination to thwart that purpose, it would be the duty of courts to condemn it by applying the most rigid rule within their authority. Therefore we repeat that our conclusion on this point in this case is based entirely on its facts, and it would not be applicable under a different state of facts exhibiting a different intent and purpose on the part of those who violated the law, or their associates.

It might also be appropriate to state that, should either or both of the election officers, whose duty it is to immediately transmit the ballot box and uncounted ballots to the county court clerk, not be able to do so, then that duty should be performed by the other officers of the election who are not so prevented: provided, however, that the two should be divided in political faith as the statute directs.

We are of the opinion that the integrity of the ballots in the three instances presented here was established, and that the trial court properly considered the returns in the three precincts. We have accordingly done likewise.

■ Both parties attack as illegal a number of individual votes. We shall, under a well-known rule, confine ourselves to a consideration of only those mentioned in briefs, deeming issues as to others to have been satisfactorily adjudged.

The primary election law prescribes the same qualification of the voter as is demanded for a general election, and in addition that he shall be "a member of the party for whose nominees he intends to cast his vote, and shall have affiliated with said party and supported

its nominees and no person shall be deemed to have been affiliated with the party in whose primary he seeks to cast his vote, if he voted against the nominee or nominees of such party in the last general election.'' Section 1550-19, Statutes.

We shall consider, first, the votes which the contestant, Raymer, insists should be deducted from the contestee, Willis. It is conceded by the contestee that for different reasons he should be charged with seven votes cast by the following: Alfred Brown, C. M. French, Eva Kuykendall, D. A. Embry, Harrison C. Embry, Charles Sego, and J. M. Johnson. It is also conceded that 35 votes cast for the contestee should be deducted from his total on the ground that, at the preceding general election, they had voted for their neighbor, Hon. M. M. Logan, the Democratic candidate for United States Senator and against the Republican nominee for that office. Under the evidence presented as to the votes of Sylvester Kuykendall and Mrs. Truly Jones, we are of the opinion that they should also be deducted from the contestee's vote. We have therefore been constrained to reduce the vote of the contestee, Willis, from 1,059 to 1,015.

Looking at the counter contest, we find that the contestant, Raymer, concedes 37 votes should be charged to him upon various grounds of illegality.

The evidence as to the qualifications of the following 11 shows that they were not entitled to vote in the primary, and, having voted for the contestant, are chargeable to him: Clifton Keown, Jack Flener, Jasper Wooley, Mrs. Jasper Wooley, L. C. Dossey, Ray Raymer, Richard Walker, John Keown, Willie Embry, Earl Willis, Clara Willis, and Bennie Lindsay.

Ray Wells failed to detach the secondary stub which bore his name before placing his ballot in the box. This resulted in exposing how he had voted, that is, for the contestant, while it was being counted by the election commissioners. Although the new election law provides that failure of the voter to detach the secondary stub shall not invalidate his ballot, it was held in State Board of Election Commissioners v. Coleman, supra, that that portion of the law was unconstitutional as invading the secrecy of the ballot, and this vote should not have been and is not to be counted for the contestant.

The vote of Mrs. Leonard Webb was challenged by the contestant as having been illegally cast for the con-

testee, but on the trial she testified that she had voted for the contestant, and, under the rule of Drennan v. Roberts, 234 Ky. 574, 28 S. W. (2d) 735, this vote must be deducted from the contestant's total.

It is conceded that Otha Cook voted illegally. The evidence as to how he voted was sufficient, in our opinion, to say that it was for the contestant, and this vote is therefore charged to him.

Bringing together these deductible votes (52) reduces the vote of the contestant, Raymer, from 1,045 to 993.

It appears therefore that the corrected returns are: Willis, 1,015, and Raymer, 993—giving the former a majority of 22 votes.

Other votes were challenged by each party which need not be specifically mentioned. The evidence as to the affiliation with the Republican Party of some whose right was questioned upon that ground was not sufficient, in our opinion, to warrant their deduction.

There were a few votes challenged in the petition and the counter contest upon a stated ground of illegality, e. g., because of residence in the precinct an insufficient length of time, but the evidence did not sustain that allegation, although it did show that the vote was illegally cast, e. g., that it was voted openly without conforming to the statutes. Under the general rule of practice that there must be both allegation and proof to sustain a judgment, we are of the opinion that such votes cannot be deducted from the party for whom they were cast.

In the general election preceding this primary, the Democratic candidate for Representative in Congress had no Republican opposition. A few persons who voted in this primary had cast their complimentary vote for him. Counsel express doubt as to their right to participate in the Republican primary. We are of the opinion that such a complimentary vote does not manifest an intention to change one's allegiance to his party. It is not a vote against its nominee, which is the important criterion set up by the statute. Hence they had the right to vote in the primary, and such votes should not be thrown out.

■ In Edmonson county the county court undertook to create five new voting precincts after its June term next preceding this primary election. It is provided by

section 1444 of the Statutes that the county court may do this provided that no such change or division shall be made after the June term of court next preceding an election, and, further, that such change or division shall not be valid without giving due notice at least one month before any election by one newspaper publication or by posters. The publication was not thirty days before this election. The circuit court threw out these new precincts, which resulted in a net loss of 8 votes for the contestant. Because of conditions peculiar to the Straw precinct, the contestant argues that the new Dickey's Mill precinct, which was created by division of the Straw precinct, should not be thrown out, and, under that construction of the effect of the change in precincts, the result would be a net loss of 21 votes for Willis instead of the result reached by the circuit court. As to whether or not it is proper to throw out any of these precincts under the facts need not be determined, for, if it be conceded that appellant's claims should be sustained, it would not affect the ultimate result, as his opponent would still have one vote more than he.

We have also considered the claim that evidence taken after September 14th should be excluded from consideration because depositions were not taken in the time provided by law. It appears that by a timely order the circuit court granted the extension of time which permitted the taking of all depositions in the case.

From a careful consideration of the entire record, it seems to the court that the judgment should be, and it is, affirmed.

Whole court sitting.

OPINION BY JUDGE THOMAS, CONCURRING.

The present section 1482, as contained in the last supplement to our Kentucky Statutes (and which is section 4 of chapter 49 of the 1930 Acts, commonly known as the Brock-Gilbert Bill), contains, inter alia, this provision: "The judge and the sheriff of election, of opposite political faith, shall forthwith convey said ballot box and envelope to the county clerk's office, taking his receipt therefor," etc. Immediately preceding and immediately following that excerpt language is found in the more lengthy one contained in the majority opinion. One of the major questions presented in the case and determined

by that opinion was and is: What shall be the effect if such election officers should fail to comply with the inserted provisions of the statute?

There are three possible answers that might be made to the question, since the statute itself makes no provision with reference thereto, or rather it does not expressly provide what shall be the consequences of such violation, leaving the question to be answered by judicial interpretation. The three suggested possible answers are: (1) That the ballots in the box when retained by the election officers and not delivered in substantial compliance with the requirements of the statute, shall be thrown out and not counted; (2) that, notwithstanding such violations, the voters in the precinct so affected should not be deprived of their right of suffrage by the derelict officers of election, and, because thereof, the ballots should be counted by the county election commissioners; and (3) that whether the vote cast in precincts so involved should or not be counted is dependent upon collateral facts that should be established by clear and convincing proof, to be furnished by the one seeking to count them, since the fact of delay, delivery, or transportation as required by the statute would create an adverse presumption and cast the burden on such one to prove the undoubted integrity of the contents of the ballot box sought to be counted, thereby leaving the question in each case to be answered in the light of the proven facts by evidence to the extent and degree indicated.

The opinion on this question, and with which I agree, adopted the latter interpretation, (3), and concluded that under the evidence adduced the votes in the contested precincts should be counted, because the evidence clearly and convincingly shows that the involved violations were the result of ignorance on the part of the election officer, and which might well be true following so recently after the enactment of the 1930 statute. Furthermore, they were of such sparse and isolated occurrence, as to refute the conclusion that preconceived fraud was intended or attempted, or that the contents of the boxes had been disturbed in any respect whatever after the closing of the polls and until delivery was made to the county court clerk. However, if such violations prevailed to such an extent as to indicate formation and execution of a preconceived plan or scheme to alter the returns and make them evidence a different result after being delivered to the county court clerk than was true when the election

closed, then a different rule would prevail, and possibly the votes in the entire county or governmental territory so affected would be ipso facto thrown out and not counted. It will thus be seen that the majority opinion pursued a middle ground, the object and purpose of which was to so construe the statute as to prevent as much as possible opportunities for fraud, and at the same time to preserve the right of the voter to have his ballot counted as cast. The dissenting opinion adopts and approves answer 1, supra, as the correct interpretation of the intention of the Legislature in enacting the statute; but that interpretation furnishes, to my mind, the most-extended opportunities for easily committed fraud than would follow the adoption of any of the three interpretations suggested. Under it, all that the sheriff of the election would have to do, in order to prevent the counting of the votes cast at a precinct wherein his political opponents received a substantial majority, would be to delay the delivery of the ballot box and ballots to the county court clerk and to take the chances of being prosecuted and fined the insignificant amount provided by the statute for such a violation. To illustrate: If a precinct was known to contain a majority of, say 150 Democrats, or known to contain that majority of Republicans, and the sheriff of the election was of an opposite political faith to that majority, he could destroy it by failing to substantially comply with the statute by delaying the delivery of the box and the ballots to the county court clerk as directed by the statute. Such a consequence would so inevitably follow that interpretation and without any manipulation whatever with the ballot box or its contents.

On the other hand, if such a great number of precincts should be so involved as to indicate a settled scheme and purpose to defraud, and wherein opportunities for that purpose could and would be furnished, expediency would suggest, that the intention and purpose of the Legislature would more nearly be subserved by penalizing such action in such a way as to deny the reward sought to be obtained by such manifested and designed scheme.

I therefore agree with the majority members of the court in adopting the course outlined in answer 3, supra, as being the fairest and most just one of any of those named, or any that suggested themselves to the court.

OPINION BY JUDGE RICHARDSON, DISSENTING.

It is with extreme diffidence that I register my dissent to the opinion of my associates in this case. But my views of the section of the statute herein involved, and its proper construction, impel me to protest against the language used and. the conclusions reached by them. The opinion breaks down every barrier provided by law against the perpetration of fraud in election. It not only emasculates, but in effect annihilates, the statute. The purpose of the statute was to make assured, protect, and safeguard the integrity of the ballot box. The reasons for its enactment are furnished by the history of the election laws, of their nonobservance by the election officers, and their construction by the courts.

Section 1596a-3, Ky. Statutes, affords the privilege and accords the exercise of the right to the governing authorities of political parties to select a list of eight names of individuals, from which the officers who are to hold the election must be selected.

It is common knowledge that the governing authorities of political. parties in some sections of our state, when exercising the rights and privileges given to them by that section of the statute, indulged in the practice of selecting and placing on the list of the eight names those individuals who were known to have had acquired experience and skill in the art of perpetrating frauds in elections, and who could and would dexterously, without leaving signs or tokens thereof, debauch the ballot box. Fraud in elections is sometimes engaged in by only one or two individuals, but it is generally perpetrated in the execution of a scheme, design, or plan by a group or organization. The number of cases in the courts arising therefrom during the past several years have crowded each other on the courts' dockets. Since 1900 and until the enactment of the act of 1930 (chapter 49), which is construed by the court in this case, section 1596a-3, Ky. Statutes, authorized and intrusted the care and custody of the ballot boxes to the election officers from the closing of the polls until they were delivered to the county clerk's office, and two days were therein allowed for the election officers to discharge these statutory duties.

On account of the deference and respect of the courts to the supreme and all-important right of the

voters to exercise their sovereign right and sacred duty to cast their ballots according to their own choosing, and to have them correctly counted, this court has repeatedly in a large number of cases announced and adhered to the rules which the court in its opinion in this case applies by the use of the following language:

"That, if the statutes do not expressly declare that noncompliance with a specified procedure shall result in throwing out the precinct or other district, a noncompliance that does not affect the fairness and equality of the election or the ascertainment of the true result will not vitiate the election. 9 R. C. L. 1091, 1092; Marilla v. Ratterman, 209 Ky. 409, 273 S. W. 69; Muncy v. Duff, 194 Ky. 303, 230 S. W. 49; Craig v. Spitzer, 140 Ky. 465, 131 S. W. 264, and cases cited. Cf. Stewart v. Wurts, 143 Ky. 50, 135 S. W. 434. To hold otherwise would be to subordinate the substance to the form, the end to the means. It is a transcendent rule that the right of suffrage will not be destroyed by irregularities or derelictions on the part of officers charged with the duty of conducting the election fairly and honestly, unless their misbehavior was such as to render impossible of judicial determination the will of the people as expressed at the polls."

The purpose of the act of 1930 (section 1482) was not only to repeal section 1596a-3, but to abrogate the exceptions and modifications thereof which had been grafted onto it by its construction by this court. By the construction of section 1482 as given to it by the court's opinion, it and the repealed section 1596a-3 are identical in meaning and in purpose. The opinion of the court grafts onto section 1482 the exceptions and modifications which the former opinions of this court added to and took from by construction section 1596a-3. Thus we have a new law in language, intent, and purpose, and by the opinion of the court identical with the repealed statute.

In the multiude of cases arising out of fraud in elections and involving the actions and conduct of election officers, in connection with the relationship thereto, this court was in most, if not in all of them, from the very nature of the charge, compelled to rely exclusively on the testimony of the officers of election and those who engaged in the perpetration of the fraud under their supervision, and oftentimes with their assistance. Be-

cause of the lack of experience in such nefarious and pernicious practices, it may be truly said that the ability of the courts to discern and expose fraud in such cases is about as unequal to the agility of those who engage therein in such a successful manner as to prevent a discovery thereof, as would be the qualifications of any member of the court to engage with Tunney in a fistic combat. The failure of the law as observed by the election officers and as administered by the courts were the reasons for the enactment of the act of 1930.

Section 1596a-3, supra, as it was observed by the election officers, construed and administered by the courts, was not only impotent as an impediment, but as a preventative against the perpetration of fraud in elections by the election officers and forces acting in concert with them, it was a consummate failure.

Prior to the enactment of section 1482 and during the existence of the repealed section 1596a-3, another section provided that, "where election officers fail to do their duty, or shall wilfully perform it in such a way as to hinder the object of the law, they may be punished by fine and imprisonment." A penalty was provided for a voter repeating or voting more than once at the same election, or voting in more than one precinct; for tampering with the ballots; for receiving a bribe; for bribing another; for unlawfully interfering with an election. These provisions of the statute are in their nature supplementary to section 1596a-3 to protect the integrity of the ballot boxes. These penal statutes have neither prevented nor deterred the commission of fraud in the counting, custody, and caring for the ballots cast in elections. All of them together scarcely hindered or delayed, much less prevented, the pollution of the ballot and the corruption of elections. The wisdom of the General Assembly and its admiration of, and desire for, purity in elections, and in order to remedy the defects in the law then in existence as construed and administered by the courts, and by reason of which fraud and corruption were generally indulged in so frequently, actuated the General Assembly at its 1930 session to enact a new election law. One of its provisions is section 1482, Ky. Statutes (Baldwin's 1930 Supplement), wherein it is provided:

"After all voters have voted, and the time to close has arrived, the officers shall announce the

same at the door of the voting room and close the polls. They shall then go and take charge of the ballot box, at the booth, and in the presence of each other shall place the lock on the small vent lid and securely lock it, and return the key to the county clerk. Said election officers shall then stamp upon all unused stubs and ballots, with rubber stamp or by writing on the stub and the ballot attached thereto, the word 'unused' and place said stub or ballot book and all other utensils or election material into a linen envelope, to be provided by the county clerk for that purpose, and shall seal with sealing wax across the seal of the envelope and place the county election seal upon said wax, so as to make the letters plainly visible in three different places on said envelope, and each officer shall write his name across said sealed portion of said envelope. The officers of election shall immediately deliver the ballot box and the envelope containing the unused ballots to the county clerk. The judge and the sheriff of election, of opposite political faith, shall forthwith convey said ballot box and envelope to the county clerk's office, taking his receipt therefor. Said officers shall see that no person other than themselves has access to, or custody of, said ballot box, and they shall each remain in the presence of the other, until said box and envelope is delivered to the county clerk.

"The ballot box shall remain locked, from the time it leaves the county clerk's office and is returned to said office, and until the county election commissioners shall unlock the same for the purpose of counting the ballots as herein provided."

This provision was intended to, and does, supersede not only section 1596a-3, but the construction thereof as had been given by this court to that section, prior to the time section 1482 became operative. It should be presumed that the General Assembly was as familiar with the construction by this court of section 1596a-3 as it was with the contents of the section. The very language of section 1482, and its purpose, leave no room for doubt that it was intended in its effect and operation to be mandatory. This sentence in it, "The officers of election shall immediately deliver the ballot box and the envelope containing the unused ballots to the county clerk," thus

makes this duty mandatory as to all of the officers of election, although there appears therein this sentence,

"The judge and the sheriff of election of opposite political faith, shall forthwith convey said ballot box and envelope to the county clerk's office, taking his receipt therefor."

These two sentences should not be so construed by the court as to relieve any one or more of them of the duties thereby imposed. A reasonable construction permits both of the quoted sections to operate, in order to avoid the ballot box falling into the hands of one officer, as appears in the present case. The construction of these two sentences is supported by the presence in this section of this language:

"They shall each remain in the presence of the other, until said box and envelope is delivered to the county clerk."

The sentence, "The judge and the sheriff of election, of opposite political faith, shall forthwith convey said ballot box and envelope to the county clerk's office, taking his receipt therefor," should not be construed to relieve the four election officers of the mandatory duty imposed upon them by the first sentence quoted from this section of the Statutes.

Section 1482, Ky. Statutes, is not a penal statute. The duty thereby imposed on all four of the election officers to deliver immediatly the ballot box to the county clerk is by its own language mandatory, but, in the case of an emergency, if one or both of the officers designated in the latter sentence cannot immediately deliver the ballot box to the county clerk, then some one of the four should take his place and discharge that duty.

In, U. S. v. Baldridge (C. C.) 11 F. 552, 557 section 246 of the Code of Alabama, which is in these words, was before the court:

"It is the duty of all inspectors of elections in the election precincts, immediately upon the closing of the polls, to count out the votes so polled."

In construing it, the court said:

"This statute prescribes what the duty is, and the statutes of the United States make the duty mandatory that the inspectors shall, immediately

upon the closing of the polls, count out the votes so polled. . . .

"The word 'immediately' here is the word to be construed, together with the other words of the section. It is to receive a reasonable construction, and does not mean that upon the instant or moment of time when the polls are closed that the counting shall begin, because that would be impossible and impracticable. Sometime would ordinarily elapse and be employed in preparing for the counting out of the vote; but then it clearly does mean that there is to be no unnecessary delay; that upon the closing of the polls the next thing to be done is the counting out of the votes. It means that no other business shall intervene to occupy and distract the attention of the officers in charge until the matter in hand shall be consummated. This view of the matter rests upon reason as well as the letter of the law.

"The object of the statute manifestly was that there should be no delay, because delays would offer opportunity for evil-disposed persons to tamper with the box, and change or rifle it of its contents. The object is that no opportunity shall be afforded which would serve as a suggestion or temptation to persons to tamper with the contents of the ballot box.

"It doubtless often occurs that some delay is necesary—as, for instance, to get lights; and in some cases a change of place from that where the voting was done might be rendered necessary by the circumstances surrounding the parties, and even the taking of food might be a necessity under the circumstances; but in such cases the ballot-box and its contents should be placed and kept securely in the custody and control of those responsible for it."

No authority, logic, or reason is offered by the court in the present case for not construing and applying the word "immediately" as it was construed and applied in the Baldridge case. The opinion of the court cites the Baldridge case as authority, and then not only ignores it, but applies principles in conflict therewith, and thus authorizes the counting of ballots which were in the sole possession of one election officer from 36 to 40 hours, and "who leant to Willis," the beneficiary of these particular ballots.

Even under the rule enunciated in Edwards v. Logan, 114 Ky. 312, 70 S. W. 852, 854, 75 S. W. 257, 24 Ky. Law Rep. 1099, 25 Ky. Law Rep. 435, the contents of these three ballot boxes should not be received and counted.

The language of this court in that case, and which is applicable to the present one, is:

"'If the boxes have been rigorously preserved, the ballots are the best and highest evidence, but, if not, they are not only the weakest, but the most dangerous, evidence.' Judge Cooley, in his work on Constitutional Limitation (625), announces substantially the same rule. Also, see People v. Sackett, 14 Mich. 320; People v. Cicott, 16 Mich. 283, 97 Am. Dec. 141. The authorities are abundant that, where ballots have been so exposed as to have offered opportunity to be tampered with, and have not been guarded with that zealous care which will contravene all suspicion of substitution or change, they lose their presumptive purity, and are no longer to be relied on as evidence in a contest or judicial inquiry as to the result of an election. McCrary, Elect. 475, etc.; Powell v. Holman, 50 Ark. 94, 6 S. W. 505; Hudson v. Solomon, 19 Kan. 177 (Opinion by Brewer, J.); Hartman v. Young, 17 Or. 150, 20 P. 17, 2 L. R. A. 596, 11 Am. St. Rep. 787.''

This is a typical case for the application of the law laid down by this court in Edwards v. Logan, supra, even if the new section of the statute does not operate to annul this court's more recent interpretation and application of the old statutes.

It may be suggested that for a paltry sum some election officers would hold out ballot boxes for the purpose of invalidating the ballots cast in that particular precinct, and thereby defeat a candidate. It may be admitted that this may occur in isolated instances, but it is equally as true that, if such officers in any precinct should for a small sum be influenced to so hold out the ballot box to invalidate the ballots, the same officers for an additional sum would tamper with, and destroy, the actual vote cast in the precinct. Every rule of action prescribed by the supreme power of the state, commanding what is right and prohibiting what is wrong, frequently works a hardship against the highest citizenship of some members of society.

Fair, free, and honest elections are the desire and purpose of the law. And, whilst the construing of section 1482 to be mandatory might in isolated cases result in a hardship to a candidate, it is very clear that such construction will result in depriving those who engage in committing fraud in elections of both time and opportunity of commiting acts to destroy in an entire county, district, or even the state, by the execution of a general plan of defeating an honest election, and a fair and free count of the ballots cast thereat.

The old law, section 1596a-3, required a count of the ballots, the sealing of them, the inclosing of them in a ballot box, securely locked, and a certificate showing the count to be signed by all the election officers, and returned within the ballot box to the county clerk's office. This provision afforded slight means of detecting and discovering fraud in elections, committed by election officers and those acting with them, between the time of closing the polls and the delivery of the ballot box to the county clerk. Section 1482 requires the ballots in the ballot box to be returned to the county clerk, but it requires no certificate, and authorizes the making of no record by the election officers, which might be used in lieu of the certificate authorized by the repealed law and which might be used to check and to discover the tampering with the ballots by the election officers between the time of closing the polls and the delivery of the ballot box to the county clerk to be placed by him under guard and kept thereunder until the ballots are counted. The only protection against fraud afforded by section 1482 is the honesty and integrity of the election officials who deliver the ballot box to the county clerk. It is plain that, if they are corrupt or willing to participate in tampering with the ballots, or permit them to be tampered with during this space of time, there is no means or methods provided by the law to prevent them from being tampered with, or to discover and disclose such tampering except the officials who have the custody of the ballot box during that interval. It should be conceded that, if they are of that type and character who will engage in the commission of fraud, they will exonerate themselves and save the integrity of the ballot by ''swearing a lie like a gentleman.'' This shows the importance of the courts requiring a strict compliance with section 1482.

In the present case the ballot boxes in the three precincts in the representative district were carried by one

officer in each of the precincts to his home where the same remained from Saturday night until some time the following Monday morning, or from 36 to 40 hours, thus affording ample time and opportunity for tampering with the ballots in these respective precincts.

In these three precincts it appears that the officers who carried the ballot boxes to their homes "leant for Willis," the contestee. The county clerk of Edmonson county testified that the ballot boxes used in that county "easily admitted a 100 page magazine to be stuffed under the lid into the box, without opening the vent or wrinkling the magazine." "To turn the box upside down and shake out a ballot was a simple process, and to replace the ballot so removed with another."

I submit that, if the election officers in the three precincts involved may be afforded the opportunity of 36 to 40 hours time in which to tamper with the ballot boxes of the type and charcater shown by the evidence to have been used in this election, and that section 1482 be construed as authorizing such disregard of it, then the election officers in any other precinct in any other or subsequent election may disregard it, and may retain in their individual custody, at their homes or wherever convenient, the ballot boxes containing the ballots of the voters under the authority of this case. Such a construction of the statute affords an "Appian Way" to fraud in elections, and renders section 1482 without force and effect, and leaves the section repealed by it in effect. The giving to it the construction given by this court, in the majority opinion, makes it in effect and purpose the same as the law which it was intended to supersede, and leaves those who desire to continue the perpetration of frauds in elections without let or hindrance, in the same manner and way in which fraud was committed in elections prior to its enactment. When this court by its construction of section 1482 permits it to operate as mandatory then the candidates and their friends in the future will know the duty resting upon election officers to comply with it, and that the duty must be discharged by them or the ballots will not be counted in case of contest. The authorities of the political parties will then select and submit names of individuals for election officers who will perform their duty instead of selecting individuals who will disregard their oath of office and statutory duty in order to win

election by means of fraud, as history of elections in this state shows has been done.

With these views, I am constrained respectfully to dissent from the majority opinion.